**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK L. MCHUGH, an individual, | |
| Plaintiff, | No. C 07-03677 JSW |
| v. | **CLAIM CONSTRUCTION ORDER** |
| HILLERICH & BRADSBY CO., a private company, | |
| Defendant. | |

The Court has been presented with a technology tutorial and briefing leading up to a hearing pursuant to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996). This Order construes the eight claim terms selected by the parties, which appear in the patent at issue in this case, United States Patent No. 5,806,091 (the "'091 Patent"), entitled "Hand Grip Aid."

**BACKGROUND**

Plaintiff Mark L. McHugh is an inventor of a hand grip aid for use with sports equipment, exercise equipment, manual work equipment, or any other equipment that has a handle. ('091 Patent, 1:7-9.) The '091 Patent is directed to the field of technologies that prevent hand damage and discomfort when such handles are gripped for prolonged periods of time. The patent asserts that the prior art solutions for this damage and discomfort range from thick gloves to pads that protect a person's hand. (1:21-23.) However, the patent asserts that the prior art solutions reduce the tactile feel of the hand. (1:25.) The '091 Patent claims to be an improvement over the prior art because it provides a support to distribute the force from a

hand-held device onto the entire hand. (1:43-45.) Thus, the patent asserts that advantages of the invention include reduced hand damage, improved comfort, a good tactile feel, and the ability of the invention to be worn with a glove or without a glove. (1:57-62.) Hillerich & Bradsby Co. ("H&B") is a company that manufactures gloves which McHugh alleges embody the claimed technology of the '091 Patent.

## ANALYSIS

**A.     Legal Standard.**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water*, *Inc*. *v*. *Safari Water Filtration Sys*., *Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004). The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman*, 517 U.S. at 372. The inquiry into the meaning of the claim terms is "an objective one." *Innova/Pure Water*, 381 F.3d at 1116. As a result, when a court construes disputed terms, it "looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id*. In most cases, a court's analysis will focus on three sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments*, *Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). However, on occasion, it is appropriate to rely on extrinsic evidence regarding the relevant scientific principles, the meaning of technical terms, and the state of the art at the time at the time the patent issued. *Id.* at 979-981.

The starting point of the claim construction analysis is an examination of the specific claim language. A court's "claim construction analysis must begin and remain centered on the claim language itself, for that is the language that the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Innova/Pure Water*, 381 F.3d at 1116 (internal quotations and citations omitted). Indeed, in the absence of an express intent to impart a novel meaning to a term, an inventor's chosen language is given its ordinary meaning. *York Prods*., *Inc. v. Cent. Tractor Farm & Family Center*, 99

1   F.3d 1568, 1572 (Fed. Cir. 1996). Thus, "[c]laim language generally carries the ordinary
2   meaning of the words in their normal usage in the field of the invention." *Invitrogen Corp. v.*
3   *Biocrest Mfg.*, *L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003); *see also Renishaw v. Marposs*
4   *Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (recognizing that "the claims define
5   the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in
6   all cases with the actual words of the claim"). A court's final construction, therefore, must
7   accord with the words chosen by the patentee to mete out the boundaries of the claimed
8   invention.

9         The court should also look to intrinsic evidence, including the written description, the
10  drawings, and the prosecution history, if included in the record, to provide context and
11  clarification regarding the intended meaning of the claim terms. *Teleflex*, *Inc. v. Ficosa N. Am.*
12  *Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002). The claims do not stand alone. Rather, "they
13  are part of 'a fully integrated written instrument.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315
14  (Fed. Cir. 2005) (en banc) (quoting *Markman*, 52 F.3d at 978). The specification "may act as a
15  sort of dictionary, which explains the invention and may define terms used in the claims."
16  *Markman*, 52 F.3d at 979. The specification also can indicate whether the patentee intended to
17  limit the scope of a claim, despite the use of seemingly broad claim language. *SciMed Life Sys.*,
18  *Inc. v. Advanced Cardiovascular Sys.*, *Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (recognizing
19  that when the specification "makes clear that the invention does not include a particular feature,
20  that feature is deemed to be outside the reach of the claims of the patent, even though the
21  language of the claims, read without reference to the specification, might be considered broad
22  enough to encompass the feature in question").

23        Intent to limit the claims can be demonstrated in a number of ways. For example, if the
24  patentee "acted as his own lexicographer," and clearly and precisely "set forth a definition of
25  the disputed claim term in either the specification or prosecution history," a court will defer to
26  that definition. *CCS Fitness*, *Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). In
27  order to so limit the claims, "the patent applicant [must] set out the different meaning in the
28

3

specification in a manner sufficient to give one of ordinary skill in the art notice of the change from ordinary meaning." *Innova/Pure Water*, 381 F.3d at 1117. In addition, a court will adopt an alternative meaning of a term "if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *CCS Fitness*, 288 F.3d at 1367. For example the presumption of ordinary meaning will give way where the "inventor has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing clear disavowal of claim scope." *Gemstar-TV Guide Int'l Inc. v. ITC*, 383 F.3d 1352, 1364 (Fed. Cir. 2004). Likewise, the specification may be used to resolve ambiguity "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.

However, limitations from the specification (such as from the preferred embodiment) may not be read into the claims, absent the inventor's express intention to the contrary. *Id*. at 1326; *see also CCS Fitness*, 288 F.3d at 1366 ("[A] patentee need not 'describe in the specification every conceivable and possible future embodiment of his invention.'") (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)). To protect against this result, a court's focus should remain on understanding how a person of ordinary skill in the art would understand the claim terms. *Phillips*, 415 F.3d at 1323.

If the analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language, a court then may turn to extrinsic evidence, such as expert declarations and testimony from the inventors. *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained.") (emphasis in original). When considering extrinsic evidence, a court should take care not to use it to vary or contradict the claim terms. Rather, extrinsic evidence is relied upon more appropriately to

4

assist in determining the meaning or scope of technical terms in the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996).

Dictionaries also may play a role in the determination of the ordinary and customary meaning of a claim term. In *Phillips*, the Federal Circuit reiterated that "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meanings of words...." *Phillips*, 415 F.3d at 1322. The *Phillips* court, however, also admonished that district courts should be careful not to allow dictionary definitions to supplant the inventor's understanding of the claimed subject matter. "The main problem with elevating the dictionary to ... prominence is that it focuses the inquiry on the abstract meaning of the words rather than on the meaning of claim terms within in the context of the patent." *Id*. at 1321. Accordingly, dictionaries necessarily must play a role subordinate to the intrinsic evidence.

In addition, a court has the discretion to rely upon prior art, whether or not cited in the specification or the file history, but only when the meaning of the disputed terms cannot be ascertained from a careful reading of the public record. *Vitronics*, 90 F.3d at 1584. Referring to prior art may make it unnecessary to rely upon expert testimony, because prior art may be indicative of what those skilled in the art generally understood certain terms to mean. *Id.*

**B.    Claim Construction.**

   **1.    "member" or "elongated resilient member"**

Claim 1 of the '091 Patent recites a "hand grip configured to fit in a user's hand and for use with a handled instrument, comprising: an elongated resilient member having an average width of approximately 4-15 mm and an average thickness of approximately 1-10 mm." (5:11-15.) The word "member" also appears in Claims 5, 12, and 13. H&B argues that the entire phrase "elongated resilient member" must be construed by this Court and that it should be construed to mean "a long and narrow grip having a length greater than three times an average width made of plastic, rubber, or other flexible material that extends across two or more fingers." (Joint Claim Construction and Pre-hearing Statement ("Statement"), Ex. A.)

5

1   McHugh, on the other hand, argues that only the word "member" needs to be construed and that
2   it should be construed to mean "component." (*Id.*)  In the alternative, McHugh argues that the
3   phrase "elongated resilient member" should be construed to mean "long and thin elastic
4   component." (*Id.*)  Thus, because both parties offer proposed constructions for the term
5   "elongated resilient member," the Court will construe this term.

6   Both parties contest each of the three words in the term "elongated resilient member."
7   As always, the Court begins with an examination of the specific claim language of the patent to
8   determine the subject matter which the patentee regards as his invention.  Claim 1 recites a
9   "hand grip ... comprising: an elongated resilient member ... and a retainer connected to the
10  member." (5:11-18.)  In the patent claim context the term "comprising" is well understood to
11  mean "including but not limited to." *Cias, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1361
12  (Fed. Cir. 2007).   Therefore, while McHugh's hand grip must include a member and a retainer,
13  it may include other parts as well.  However, if this Court were to adopt H&B's proposed
14  construction that "member" means "grip," then a reading of the patent would indicate that the
15  grip requires a grip and a retainer, which does not make sense because an object cannot be
16  defined as itself plus something else.  In construing the meaning of a term in the claim we must
17  look at its context within the whole claim. *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082,
18  1088 (Fed. Cir. 2003) (the context of the surrounding words of the claim also must be
19  considered in determining the ordinary and customary meaning of those terms).  Here, McHugh
20  chose to label it as a "member" in the claim language, not a "grip."  Reading the term "member"
21  in the context of the whole claim leads to the conclusion that "member" cannot mean "grip."

22  Additionally, H&B directs the Court's attention to several passages in the written
23  description which purportedly show that "member" should mean "grip." (Opp. Br. at 19.)  For
24  example, the patent in one part recites that the elongated resilient member has an undulated side
25  and in another part that the grip has one side with an undulating surface.  (1:46-47; 2:46.)
26  However, this could mean that the grip has an undulating side *because* the member has an
27  undulating side.  This interpretation would make sense if, as here, the grip is comprised of
28  

6

1 mostly a member and a retainer to keep the member attached to the hand. That both the
2 member and the grip have an undulating side does not necessarily mean the member and the
3 grip are the same thing. In any event, even if there were ambiguity in the specification as to
4 whether "member" meant "grip," the clear language of the claims themselves indicate that
5 "member" does not mean "grip." Furthermore, the specific claim language is more significant
6 that the specification in construing claim terms. "The written description part of the
7 specification itself does not delimit the right to exclude. That is the function and purpose of
8 claims." *Markman*, 52 F.3d at 980. *See also Merrill v. Yeomans*, 94 U.S. 568 (1876) (holding
9 that the claims are of primary importance "in the effort to ascertain precisely what it is that is
10 patented"). Therefore, the Court finds that "member" does not mean "grip."

11 H&B further argues that if the Court construes "member" to mean "component," that
12 construction could potentially encompass pads, which H&B claims the '091 Patent teaches
13 against. (Opp. at 20.) In this case, if the specification were to disparage all pads generally, the
14 claims could not be construed to encompass all pads generally. *See Honeywell Int'l, Inc. v. ITT*
15 *Indus., Inc.,* 452 F.3d 1312, 1319 (Fed. Cir. 2006) (where the specification makes clear that the
16 invention does not include a particular feature, that feature is deemed to be outside the reach of
17 the claims of the patent, even though the language of the claims, read without reference to the
18 specification, might be considered broad enough to encompass the feature in question).
19 However, the '091 Patent does not disparage all pads, but merely pads that protect a person's
20 palm. (1:23.) The invention here is designed to fit between the palm of the user's hand and the
21 base of the user's fingers. (5:16-17.) Thus, H&B's argument here is without merit.

22 Next, H&B argues that an "elongated" member means that the member is "long and
23 narrow" and its length is "greater than three times an average width" such that the member
24 "extends across two or more fingers." (Statement, Ex. A.) Conversely, McHugh argues that
25 "elongated" should mean "long and thin." Again, the Court looks to the specific claim language
26 in the patent first. Here, the claim language indicates that "elongated" does not necessarily
27 mean what H&B suggests. In Claim 1, even though "elongated" is used, Claim 1 does not have
28

7

1    a specific length limitation. However, in Claim 16, the member is described as "elongated" but
2    the claim does include a specific length requirement of "a total length greater than three times
3    an average thickness and greater than three times an average width." (6:19-21.) Thus, the
4    claim language indicates that the term "elongated" is not tied to a specific length limitation.

5    Next, the Court may look to the specification to provide insight as to how to construe the
6    claim terms. *See Markman*, 52 F.3d at 979. The written description indicates that in other
7    embodiments of the invention, the grip may fit next to one, two, or three fingers rather than
8    four. (4:21-22.) "This embodiment may be useful where a handle grip area is particularly small
9    and where only a small grip 30 can be accommodated." (4:24-26.) Thus, the written
10   specification suggests that it is possible for an embodiment of the invention to be fitted for use
11   under the smallest finger, where the length of the grip may be shorter than three times the
12   average thickness and three times the average width. Further, the specification describes an
13   embodiment that may be used on one finger, which contradicts H&B's requirement that the
14   member extend across two or more fingers.

15   H&B argues that during the prosecution of the patent McHugh narrowed his claims in
16   order to avoid prior art and therefore he should not now be allowed to broaden his claims to
17   capture abandoned subject matter. Specifically, H&B points out that in prosecution of the
18   patent, McHugh stated that "elongated member" means that the member has a total length
19   greater than three times an average thickness and greater than three times an average width.
20   (Opp. Br., Ex. 8.) Meanwhile, McHugh points out that in a response to an Office Action,
21   McHugh stated that "elongated" means "long and narrow." (Reply at 5.) Ultimately, McHugh
22   abandoned the length limitation language for the current width and thickness limitations at the
23   recommendation of the examiner. (Brief, Ex. 9.) In this case, the Court does not need to look
24   to the prosecution history because the claim language and the written description are sufficient
25   to determine what "elongated" means.

26   Lastly, both parties dispute the meaning of "resilient." McHugh argues for a proposed
27   construction of only the term "elastic" and H&B argues for a proposed construction of "plastic,
28

8

rubber, or other flexible material." On this point, neither party's arguments are very persuasive. McHugh refers to extrinsic evidence such as dictionaries to support its proposed construction, without referring to any intrinsic evidence. H&B argues that the specification provides insight as to how "resilient" should be construed. The patent summary states that the "member can be constructed of plastic, rubber, or other material that provides flexibility and easily accommodates the user's fingers." (1:52-54.) Further, the written description states that "[a]ny type of resilient material, such as plastic or rubber, can be used for the invention." (2:64-65.) H&B attempts to hybridize these two statements to show that "resilient" means "plastic, rubber, or other flexible material." However, a close reading of the written description demonstrates that this interpretation is incorrect. First, limiting "resilient" to plastic or rubber is an improper limitation of the claim language. "Limitations from the specification (such as from the preferred embodiment) may not be read into the claims, absent the inventor's express intention to the contrary." *Teleflex*, 299 F.3d at 1326; *see also CCS Fitness*, 288 F.3d at 1366. Secondly, the patentee does describe "resilient material" in the specification, but does not mention anything about "flexible material." Thus, the specification does not clearly set forth what "resilient" materials are. McHugh offers several dictionary definitions for resilient, such as "that which returns to its original shape following a deformation in shape." (Brief at 9.) In the absence of clear language in intrinsic evidence, the Court may look to external evidence for guidance. Surveying many dictionaries, McHugh finds a general consensus as to how a person would interpret "resilient," and the Court adopts this definition.

Accordingly, the Court construes the term "member" to mean: "long and thin component which returns to its original shape following a deformation in shape."

### 2. "configured to fit"

McHugh asserts that this term does not require construction, while H&B asserts that it does. H&B contends that whether or not there is an ultimate finding of infringement of the '091 Patent depends at least partly on a determination of what "configured to fit" means. "Victory in an infringement suit requires a finding that the patent claim covers the alleged infringer's

9

1  product or processes, which in turn necessitates a determination of what the claim terms mean."
2  *Markman*, 517 U.S. at 374. Thus, this Court will construe the term "configured to fit."
3  Although McHugh asserts that this term does not require construction, to the extent that
4  it does, McHugh argues that "configured to fit" should mean "designed to fit." H&B also agrees
5  to this construction. Accordingly, the Court adopts both parties' proposed construction and
6  construes the term "configured to fit" to mean: "designed to fit."

### 3. "base of the user's fingers"

McHugh asserts that this term does not require construction, while H&B asserts that it does. Nevertheless, because there is a controversy regarding this term, this Court will construe the term "base of the user's fingers." *See Markman*, 517 U.S. at 374.

Claim 1 of the patent recites a hand grip comprising an elongated resilient member that is "configured to fit at a base of the user's fingers in a gap between the palm of the user's hand and the base of the user's fingers." (5:15-17.) McHugh's proposed construction for "base of the user's fingers" is "over the proximal phalanx A2 pulley region of the user's fingers." H&B's proposed construction is "the location where the palm joins the fingers."

The primary controversy regarding this term is whether "base of the user's fingers" refers to the specific location where the palm joins the fingers or whether "base" should be construed more broadly to include the entire area over the proximal phalanx A2 pulley region of the user's fingers. The location where the palm joins the fingers is within the area over the proximal phalanx A2 pulley region of the finger. (Brief at 21.) As always, the Court begins its analysis with the language of the claim itself. The claim states that the elongated resilient member is supposed to fit "at the base of the user's fingers ... in a gap between a palm of the user's hand and the base of the user's fingers." (5:15-17.) Here, the claim language indicates that the gap is not a separate location apart from the base of the user's fingers or the palm of the user's hand. Instead, the gap is formed by an interaction of the fingers and the palm. This conclusion is further supported by the written description. The written description states that when users grip any equipment with a handle, the superficial transverse "metacarpal ligament,

10

along with associated muscle and skin tissue, [is] forced over the fingers." (1:50-51.) When the skin above the superficial transverse metacarpal ligament rubs the skin near the base of the fingers, the skin "often becomes blistered or callused with repetitive use of hand-held equipment." (2:40-41.) The invention is designed to fill this gap and prevent the ligament and associated muscle and skin tissue from being forced over the fingers.

The Court finds that H&B's construction is more persuasive, as its construction is supported by the written description. The written description indicates that the patented invention "fits in the user's hand near where the palm joins the fingers." (1:43-44.) As the claim states that the elongated member is configured to fit at the base of the user's fingers, this is clear evidence that the base of the fingers is where the palm joins the fingers.

McHugh's proposed construction also provides for this placement because the location at which the palm joins the fingers is contained within the proximal phalanx A2 pulley region. However, McHugh's construction is too broad because the proximal phalanx A2 pulley region encompasses not only the location where the gap is formed, but the part of the finger above that location as well. If the member were above both the palm and the base of the fingers, it would not be able to separate the superficial transverse metacarpal ligament from the fingers. Thus, the claim language and the written description indicate that the base of the user's fingers is not a region, but rather a specific location on the hand. Most importantly, McHugh's construction is not supported by the patent claims or the intrinsic evidence of the patent.

Accordingly, the Court adopts H&B's proposed construction and construes the term "base of the user's fingers" to mean: "the location where the palm joins the fingers."

**4.   "adjacent to the base of the user's fingers"**

McHugh asserts that this term does not require construction, while H&B asserts that it does. Nevertheless, as there is a controversy regarding this term, this Court will construe the term "adjacent to the base of the user's fingers." *See Markman*, 517 U.S. at 374.

Claim 1 further goes on to recite that a "retainer connected to the member ... [retains] the member in the user's hand adjacent to the base of the user's fingers." (5:18-21.) As the Court

11

has already construed "base of the user's fingers" to mean "the location where the palm joins the fingers," it is now up to the Court to determine what it means to be adjacent to "the location where the palm joins the fingers." McHugh contends that it should mean "near the proximal phalanx A2 pulley region of the user's fingers" while H&B contends that it should mean "below the base of the user's fingers."

The claim language indicates that the member is "configured to fit at a base of the user's fingers ... and a retainer [retains] the member in the user's hand adjacent to the base of the user's fingers." (5:15-21.) H&B's proposal that the base of the user's fingers is the location where the palm joins the fingers is adopted by the Court because it allows for the member to sit in the gap formed at the base of the user's fingers. However, if the Court were to adopt H&B's proposed construction for "adjacent to the base of the user's finger," the member would be both at the base of the user's fingers and below the base of the user's fingers. This construction does not make sense.

On the other hand, McHugh's proposed construction is supported by the specification. The specification indicates that "adjacent" should mean "near." The written description states that the "hand grip fits in the user's hand near where the palm joins the fingers." (1:43-44.) Additionally, as stated above the proximal phalanx A2 pulley region encompasses the "location where the palm joins the fingers." Most importantly, if the member is located "near the proximal phalanx A2 pulley region of the user's fingers," this placement specification is broad enough to allow the member to fit in the gap between the base of the user's fingers and the palm of the hand.

Accordingly, the Court adopts McHugh's proposed construction and construes the term "adjacent to the base of the user's fingers" to mean: "near the proximal phalanx A2 pulley region of the user's fingers."

**5.    "in a gap" or "in a gap between a palm of the user's hand and the base of the user's fingers."**

Claim 1 recites that the elongated resilient member is "configured to fit at a base of the user's fingers in a gap between a palm of the user's hand and the base of the user's fingers."

(5:15-17.) McHugh proposes that "in a gap" should mean "in the proximal digital crease of the user's hand." On the other hand, H&B proposes that "in a gap between a palm of the user's hand and the base of the user's fingers" should mean "filling the space or void above the palm of the hand and below the base of the fingers to prevent the superficial transverse metacarpal ligament, associated tissue, and skin of the palm extending over the base of the fingers when a handle is grasped."

This Court adopted H&B's proposed construction for "base of the user's finger' above as "the location where the palm joins the fingers" and that the gap was not below the base of the fingers and above the palm, but rather formed by an interaction between the finger and the palm. This conclusion was supported by the patent's written description. H&B's proposed construction for "in gap between a palm of the user's hand and the base of the user's fingers" is problematic because there is no "space or void between a palm of the user's hand and the [location where the palm joins the fingers]." The Court must construe terms so that their usage is consistent throughout the patent. *See Phillips*, 415 F.3d at 1314. Therefore, this Court rejects H&B's construction of "in a gap between a palm of the user's hand and the base of the user's fingers." On the other hand, the Court finds that McHugh's description of the gap as the "proximal digital crease of the user's hand" is more consistent with the Court's construction of "base of the users finger."

Accordingly, the Court adopts McHugh's proposed construction and construes the term "in a gap" to mean: "in the proximal digital crease of the user's hand."

### 6. "retainer" or "a retainer connected to the member"

Claim 1 recites an elongated resilient member and a "retainer connected to the member and configured to ... retain the member in the user's hand adjacent to the base of the user's fingers." (5:18-21.) H&B argues that "a retainer connected to the member" should be construed to mean "an elastic band, strap, or T-shaped brace connected to the grip." McHugh contends that only the word "retainer" needs to be construed, and argues that it should be construed to mean "hand grip element for positioning and retaining the member."

13

This Court has found that "member" does not mean "grip." As it would be lead to a nonsensical construction of the patent terms, this Court cannot adopt H&B's proposed construction for "a retainer connected to the member." Additionally, even if the Court replaced "grip" in H&B's proposed construction with "member," H&B's proposed construction would still be incorrect. The controversy regarding this term focuses on whether the patentee intended to limit the scope of his claims through the specification.

Dependent Claim 5 recites "A hand grip as in claim 1, wherein: the retainer is a glove configured to secure around user's fingers and including an attachment to retain the elongated member in a position adjacent to the base of the user's fingers." (5:36-40.) In this claimed embodiment, the glove is the retainer and "extend[s] around to the backside of at least one of the user's fingers." (1:19-20.) Furthermore, the glove is connected to the member though an attachment to retain and position the member. (5:38-39.) However, H&B argues that the grip must be capable of use with or without a glove because the patent specification states that a key advantage of the invention is the ability to use the grip with or without a glove. (Opp. at 32.) Therefore, H&B contends that "retainer" cannot be construed to include a glove. (*Id.*)

It is established case law that when the specification "makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys.*, *Inc.* *v.* *Advanced Cardiovascular Sys.*, *Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). In this case, however, it cannot be said that the specification makes clear that the retainer does not include a glove. The summary of the invention states that "[a]nother advantage of the invention is that it can be worn with a glove or without a glove and still achieve the same beneficial results or built directly into a glove or part of a glove for ease of use and convenience." (1:59-62.) This is not a clear disavowal of the particular feature of use with a glove. Instead, the specification merely states that in one embodiment of the invention, the grip may be worn without glove or under a glove, or as a part of a glove.

H&B points to a section in the specification which states that "Grip 20 may also be used with a glove if desired. For example, grip 20 can be placed between a glove and a handle ... or inside the glove closer to the user's hand." (3:53-56.) H&B argues that the "grip" (which includes the member and the glove as a retainer) cannot be placed between a glove and a handle, as this would essentially be a glove placed between a glove and a handle. (Opp. Br. at 32.) However, H&B conflates two different embodiments of the invention. Here, the patentee merely states that the invention of Claim 1 may be worn outside of or inside of a glove. Thus, "Grip 20 may also be used with a glove, if desired." (3:53-54.) This embodiment is different from the embodiment where the retainer is a glove. The specification has not made clear that the retainer cannot be a glove and therefore the Court will not limit the explicit language of the claims.

Accordingly, the Court adopts McHugh's proposed construction and construes the term "retainer" to mean: "hand grip element for positioning and retaining the member."

### 7. "to retain the member"

McHugh asserts that this term does not require construction, while H&B asserts that it does. (Statement at 13.) However, H&B did not provide any argument to support its construction. As it appears that both parties stipulate that no construction is necessary, the Court will decline to provide one.

### 8. "attachment"

Claim 5 recites a "handgrip as in claim 1, wherein the retainer is a glove configured to secure around the user's fingers and including an attachment to retain the elongated member in a position adjacent to the base of the user's fingers." (5:36-40.) Claim 13 recites a similar usage of the term. McHugh argues that "attachment" should mean "glove component which secures the member to the glove." Conversely, H&B argues that "attachment" should mean "a strap or long thin pocket."

In determining the meaning of disputed patent terms, as always the Court begins with the claim language first. Here, the patent claim does not support McHugh's contention that the

15

attachment secures the member to the glove. Instead, the claim states that the attachment retains the "member to the ... base of the user's fingers." (*Id.*) This concept is made clear by the written description, which states that the glove material "includes attachment 52a and 52b to hold grip 20 in place over the base of the fingers." (4:34-36.) H&B's construction is more compatible with the claim language as well. Figure 5 of the patent states that "attachments 52a and 52b are elastic straps that retain the grip 20. Alternatively, an attachment can be a single strap, a long thin pocket, or other similar retainer." (4:36-38.) Here, the Court finds that McHugh was acting as his own lexicographer and, as such, his definition is accepted. H&B's construction, however, omits the "or other similar retainer" language found in the patent specification. This is an improper limitation of the patent claims.

Accordingly, the Court construes the term "attachment" to mean: "a strap or long thin pocket or other similar retainer."

### 9. "includes a plurality of sub-members"

McHugh asserts that this term does not require construction, while H&B asserts that it does. Nevertheless, as there is a controversy regarding this term, this Court will construe the term "includes a plurality of sub-members." *See Markman*, 517 U.S. at 374.

Claim 12 of the patent claims a grip as in Claim 1, wherein "the elongated member includes a plurality of sub-members each configure to fit adjacent to the base of the user's fingers." (6:1-3.) McHugh argues that no construction is required, but to the extent that a construction is required, it should mean "includes two or more sub-members." H&B argues that "includes a plurality of sub-members" should mean "includes two or more small grips incorporated into the long and narrow grip."

The Court has already found that "member" does not mean "grip." However, even substituting "member" for "grip" in H&B's construction, does not make it more correct. Claim 12 refers to an embodiment of the invention wherein the grip is actually segmented into multiple separate grips, each designed to fit at the base of the user's fingers. In the patent specification, Figure 5B shows a "glove 54 here grip 20 is broken up into four small grips 56a-d

16

that provide support to one finger each.  This is accomplished by incorporating four grips ... into each of the four fingers of a glove near the base of the fingers, as shown." (4:39-44.) Therefore, in this embodiment of the invention, the member is actually composed of two or more sub-members.  Both McHugh and H&B offer constructions which state that the member "includes" sub-members, but this is confusing because it is unclear under both proposed constructions whether the member has sub-members attached to it, or whether the member is composed of sub-members.  The patent specification clearly indicates that in this embodiment, the member is composed of sub-members.  (*Id.*)

Accordingly, the Court the term "includes a plurality of sub-members" to mean: "is composed of two or more sub-members."

## CONCLUSION

Based on the analysis set forth above, the Court adopts the foregoing constructions of the disputed terms and phrases.  The parties are ordered to submit a further joint case management report pursuant to Patent Standing Order ¶ 13 by no later than April 24, 2009.

**IT IS SO ORDERED.**

Dated: March 31, 2009

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE