IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARK L. McHUGH,

Plaintiff,

v.

HILLERICH & BRADSBY CO.,

Defendant.

/

No. C 07-03677 JSW

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Now before the Court is the motion for summary judgment of infringement filed by Mark L. McHugh ("McHugh"), and the cross-motion for summary judgment of non-infringement or, alternatively, summary adjudication of laches and willfulness filed by Hillerich & Bradsby Co. ("H&B"). Having considered the parties' papers, relevant legal authority, the record in this case, and having had the benefit of oral argument, the Court HEREBY DENIES McHugh's motion and GRANTS H&B's motion for summary judgment of non-infringement.[1]

**BACKGROUND**

**A.  Procedural History.**

Plaintiff McHugh filed suit alleging that Defendant H&B infringes U.S. Patent No. 5,806,091 (filed Nov. 14, 1996) (the "'091 Patent"). The '091 Patent relates to a hand grip aid

---

[1] In light of the Court's ruling on the issue of non-infringement, the Court does not reach the merits of H&B's motion for summary adjudication on the basis of laches and willfulness.

for use with sports equipment, exercise equipment, manual work equipment, or any other equipment that has a handle. ('091 Patent col.1 ll.7-9.)

McHugh accuses H&B's Bionic Gloves of infringing the '091 Patent. Dr. James M. Kleinert, a hand surgeon employed by H&B, designed the Bionic Gloves with pads ("Bionic finger pads") at anatomically significant positions throughout the hand. The location of those bionic finger pads is the focus of the dispute presented by this lawsuit.

The Court held a claim construction hearing, pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). On March 31, 2009, the Court issued its Claim Construction Order, in which it construed several of the disputed claim terms in the '091 Patent. The disputed claim terms and the Court's claim constructions are as follows:

| **Disputed Claim Term** | **Claim Construction** |
|---|---|
| "member" or "elongated resilient member" | "long and thin component which returns to its original shape following a deformation in shape" |
| "configured to fit" | "designed to fit" |
| "base of the user's fingers" | "the location where the palm joins the fingers" |
| "adjacent to the base of the user's fingers" | "near the proximal phalanx A2 pulley region of the user's fingers" |
| "in a gap" or "in a gap between a palm of the user's hand and the base of the user's fingers" | "in the proximal digital crease of the user's hand" |
| "retainer" or "a retainer connected to the member" | "hand grip element for positioning and retaining the member" |
| "attachment" | "a strap or long thin pocket or other similar retainer." |
| "includes a plurality of sub-members" | "is composed of two or more sub-members" |

(*See* Claim Construction Order ("CCO") at 9:21-22, 10:5-6, 11:20-21, 12:22-24, 13:19-20, 15:12-13, 16:11-12, 17:9-10.)

For the purposes of this motion, the Court need only address the location of the elongated resilient member because the Court finds that the Bionic Gloves do not contain a member "configured to fit at a base of the user's fingers in a gap between a palm of the user's hand and the base of the user's fingers." ('091 Patent col.5 ll.14-17.) This Court has construed

2

this term as requiring the member be designed to fit at the location where the palm joins the fingers in the proximal digital crease of the user's hand. (*See* CCO at 10:5-6, 11:20-21, 13:19-20.) McHugh asserts Bionic Gloves have pads located in this location. H&B asserts they do not.

It is undisputed that the Bionic finger pads are located in the A2 pulley region of a user's hands. However, the parties dispute whether pads located in the A2 pulley region are, by necessity, located "in the proximal digital crease of the user's hand." The parties also dispute whether the member limitation or the retainer limitation of Claim 1 dictates the location of the member. There are no genuine issues of material fact for a jury. This is a question of law based on the Court's claim construction and, as such, is appropriate for disposition on summary judgment.

**B.      Prosecution of the '091 Patent.**

The facts pertaining to the prosecution history of the '091 Patent are not disputed. Claim 1 of the '091 patent originally claimed: "an elongated member configured to fit adjacent to a user's superficial transverse metacarpal ligament and adjacent to a user's finger." (Declaration of Laura A. Wytsma ("Wytsma Decl.") Ex. 2 at 8.) The application went through several rejections, amendments, and interviews. The applicable amendments are as follows:

After issuing a non-final office action, the Examiner agreed to "reconsider the claims in view of language that clarified the structure of the invention and how it is placed in the hand." (*Id.* Ex. 4 at 3.) McHugh amended Claim 1 to specify the member be "configured to fit <u>into a gap</u> adjacent to a user's superficial transverse metacarpal ligament and adjacent to a user's finger <u>to space skin from the user's palm from the user's fingers</u>." (*Id.* Ex. 4 at 2 (emphasis in original).) In that response, McHugh further argued that the prior art did not teach that a "portion of the grip accommodates a 'gap' between the user's palm and the base of the user's fingers." (*Id.* at 3.)

After another rejection, in a telephonic interview, McHugh and the Examiner discussed claim limitations that might define a patentable claim. In particular, they discussed "language that clarifies how the hand grip is arranged in a wearer's hand." (*Id.* Ex. 8.) Finally, McHugh

3

amended Claim 1 to require the member be configured to fit "<u>at a base of the user's fingers</u>" in "a gap <u>between the palm of the user's hand</u>" and "<u>the base of the user's fingers</u>." (*Id.* Ex. 9 at 1 (emphasis in original).) In this amendment, McHugh also added the retainer limitation. (*Id.* at 6.) Following that final amendment, the patent issued on September 15, 1998. (*Id.* Ex. 1.)

The Court shall discuss additional facts as necessary in the analysis.

## ANALYSIS

### A. Legal Standards Applicable to Motions for Summary Judgment.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Union States Gypsum Co. v. Nat'l Gypsum Co.*, 74 F.3d 1209, 1212 (Fed. Cir. 1996). The burden of demonstrating the absence of any genuine issue of material fact rests with the moving party. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985). In order to defeat summary judgment, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." Fed. Cir. R. Civ. P. 56(e); *Matsushita Elec.*, 475 U.S. at 587.

### B. H&B's Motion for Summary Judgment is Granted.

There are two steps in an infringement analysis: (1) construing the claims of the patent in suit; and (2) comparing the properly construed claims to the accused products. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*); *see also SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1268 (Fed. Cir. 2007). The Court has construed the claims. Now the Court must determine whether, under its construction, H&B's accused devices fall within the scope of those claims.

To meet its burden on the second prong of the infringement analysis, McHugh "'must show the presence of every element or its substantial equivalent in the accused device.'" *Terlep v. Brinkman Corp.*, 418 F.3d 1379, 1384 (Fed. Cir. 2005) (quoting *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994)). McHugh bears the burden of proving

4

infringement, either literally or under the doctrine of equivalents, by a preponderance of the evidence. *See, e.g., Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

### 1. McHugh Cannot Demonstrate that H&B's Accused Devices Literally Infringe the '091 Patent.

The parties dispute whether several claim elements are literally infringed. The Court finds it unnecessary to discuss all claim limitations because literal infringement requires the patentee to prove the accused device contains each and every limitation of the asserted claim. *See Bayer AG*, 212 F.3d at 1247. The Bionic Gloves are not "configured to fit at a base of the user's fingers in a gap between a palm of the user's hand and the base of the user's fingers." ('091 Patent col.5 ll.14-17.) McHugh also attempts to argue that this limitation is not the correct limitation to define the location of the member in a user's hand. The Court does not agree.

#### a. The Bionic finger pads are not "configured to fit at a base of the user's fingers in a gap between a palm of the user's hand and the base of the user's fingers."

Claim 1 requires the member be "configured to fit at a base of the user's fingers in a gap between a palm of the user's hand and the base of the user's fingers." ('091 Patent col.5 ll.14-17.) Under the Court's claim construction, the member must be designed to fit at the location where the palm joins the fingers in the proximal digital crease of the user's hand. (*See* CCO at 10:5-6, 11:20-21, 13:19-20.) H&B argues that McHugh cannot demonstrate that the pads in the Bionic Gloves are designed to fit in the proximal digital crease of the user's hand. McHugh argues that, because both the proximal digital crease and the Bionic finger pads are located in the proximal phalanx A2 pulley region, therefore the bionic finger pads are located at the proximal digital crease. "Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim(s). ... If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG*, 212 F.3d at 1247 (citation omitted).

Neither party contests that both the proximal digital crease and the Bionic finger pads are located in the proximal phalanx A2 pulley region of the user's fingers. Both parties have also submitted evidence, through various anatomical figures, showing that the proximal phalanx A2 pulley generally covers the middle portion of the proximal phalanx and extends above (distal) and below (proximal) the proximal digital crease where the palm joins the fingers. McHugh even stated in oral argument that the pulley is quite long and extends above and below the proximal digital crease. McHugh claims these facts are dispositive. H&B asserts they are irrelevant.

McHugh concludes that, because both the Bionic finger pads and the proximal digital crease of the user's hand are located in the proximal phalanx A2 pulley region, the pads must be located in the proximal digital crease of the user's hand. Accordingly, McHugh argues that, under the Court's claim construction, the pads are located "in a gap between a palm of the user's hand and the base of the user's fingers."[2] Such logic is unsound because it parallels the classic fallacy of the undistributed middle.

H&B contends that, while the pads in H&B's bionic gloves are located in the A2 pulley region, they are above (distal) the proximal digital crease. The Court agrees. Both parties cite to the same anatomy textbook that indicates that the proximal digital crease is a line located at the same level as the hand's "webbing" between the fingers. (*See* Declaration of Christopher P. Grewe ("Grewe Decl.") Ex. F, Fig. D; s*ee also* Wytsma Decl. Ex. 25, Fig. D.) The Bionic finger pads, by contrast, are plainly located above this crease and the webbing. *(See* Wytsma Decl. Ex. 21; *see also* Grewe Decl. Ex. R.) From these pictures, and upon examining the gloves, it is apparent that the lower (proximal) stitching which attaches the bionic finger pads to

---

[2] While discussing elements of the *retainer* limitation, this Court said: "[m]ost importantly, if the member is located 'near the proximal phalanx A2 pulley region of the user's fingers,' this placement specification is broad enough to allow the member to fit in the gap between the base of the user's fingers and the palm of the hand." (CCO 12:18-21.) McHugh purports to use this language as a construction for "a gap between a palm of the user's hand and the base of the user's fingers," rather than the express claim construction given by the Court. The Court was simply clarifying that the claim construction for the *retainer* limitation is not mutually exclusive with the claim construction for the *member* limitation.

6

the gloves is level with the portion of the gloves which corresponds to the webbing between the fingers.

The tighter the glove fits, the closer the outline of the glove conforms to the shape of the human hand and the closer the bionic finger pads are to the proximal digital crease. If a glove is too large for its wearer, the bionic finger pads will be further above (distal) the proximal digital crease. By contrast, the tightest a glove can possibly be worn is when the portion of the gloves which corresponds to the webbing between fingers fits flush or tightly against the webbing between the fingers. Because the bionic finger pads do not extend below the portion of the glove which corresponds to the webbing between the fingers, the bionic finger pads cannot extend below the webbing between the fingers. At most, the bionic finger pads *touch* the proximal digital crease, but they are not located *in* the proximal digital crease. The location of the pads relative to the proximal digital crease of the Bionic Gloves is similar to the location of a page in a book relative to the binding, or crease, of the book. Pages in a book *touch* the binding, and in fact a very small portion of the page could be considered "in" the binding, but one would not say the page itself is *in* the binding of the book.

This interpretation is also supported by Dr. Kleinert's deposition, which McHugh cites in his opening brief. Dr. Kleinert is the developer and designer of the Bionic Gloves. In his deposition, Dr. Kleinert identifies that he believed it was important that "the pads were not close to the joints so that the hand could bend freely." (Grewe Decl., Ex. QQ (Kleinert 6/23/09 Depo., 70:8-10).) This description is consistent with the overall design of the Bionic Gloves, which includes "flex zones" at each joint in the hand made of thinner material than the rest of the glove to ensure that the joints can bend properly. (Declaration of James M. Kleinert, M.D. ("Kleinert Decl."), Ex. 5.)

McHugh asserts that, even if the bionic finger pads are located above the proximal digital crease when the hand is in the open position, that, by necessity, the pads must be located in the proximal digital crease when the hand is in the partially flexed position. McHugh cites Dr. Kleinert's deposition testimony as evidence that he designed the gloves to be used in the partially flexed position. (Grewe Decl., Ex. QQ (Kleinert 6/23/09 Depo., 71:6-18).) H&B does

not contest that the gloves were designed to be used in the partially flexed position. However, McHugh has brought forward no evidence that indicates that the pads somehow change location relative to the hand when the hand moves. Furthermore, when fingers are flexed, the location of the crease does not change relative to the webbing between the fingers. Therefore, because the bionic finger pads cannot extend below the webbing of the fingers, it is illogical to suppose that the bionic finger pads could shift position and be located over the proximal digital crease in a partially flexed position.

Accordingly, H&B is entitled to summary judgment of no literal infringement because no reasonable juror could find that the Bionic Gloves meet each and every limitation of the '091 Patent.

### b. The member limitation, not the retainer limitation, specifies the location of the member.

McHugh asserts that it is the *retainer* limitation, not the *member* limitation, that specifies the actual location of the *member* in the user's hand for an accused product. By contrast to the *member* limitation, the *retainer* limitation requires that the retainer must "retain the member in the user's hand adjacent to the base of the user's fingers." ('091 Patent col.5 ll.20-21.) The Court has construed this language to require that the retainer "retain the member in the user's hand near the proximal phalanx A2 pulley region of the user's fingers." (CCO 12:23-24.)

Both parties argue that the other reads the phrase "configured to fit" out of Claim 1. H&B argues that the clear language of Claim 1 specifies where the member must be designed to fit in the hand and the retainer simply clarifies the retainer's function. McHugh argues that the member limitation only determines how the product is "designed," and the retainer limitation determines where the member is actually located. Unfortunately, the parties stipulated definition of "claimed to fit" as meaning "designed to fit" is not much clearer than the claimed language. McHugh argues at length that "configured to fit" does not mean "precisely located at," but provides little argument about what "configured to fit" actually means. McHugh argues that the Bionic Gloves need only be *designed to fit* in the proximal digital crease, even if not

8

*actually located* in the proximal digital crease. However, McHugh has failed to show that the gloves actually are designed to fit in the proximal digital crease.

McHugh essentially reads out the entire member location from Claim 1 because he asserts that this Court should look only to the retainer limitation when determining the location of the member. To this end, McHugh argues that the broader retainer definition, which encompasses a region, rather than a specific location, defines the location of the member. The Court has clearly stated that the "base of the user's fingers is not a region, but rather a specific location on the hand." (CCO 11:17-18.) However, as already addressed, it is clear that the bionic finger pads were both designed to, and actually fit, above (distal) to the proximal digital crease.

McHugh also appears to argue that the Bionic Gloves need only be "capable" of filling the gap. However, neither the claimed term, nor the claim construction, support a definition that the Bionic Gloves be "capable" of filling the gap. Few courts have wrestled with the definitions of "configured to fit" and "designed to fit." This district has, however, determined that the term "'configured to' embraces the concept of a device intentionally and specifically made to act in a certain way." *Boston Scientific v. Cordis Corp.*, 2006 WL 3782840, at *2 (N.D. Cal. Dec. 20, 2006). In that matter, the Court construed the claimed "adapted to" as "configured to fit," rather than "suitable for." *Id*. Similarly, this Court finds that "configured to fit" and "designed to fit" both refer to an intentional design.

Whether defined as "configured to fit" or "designed to fit," such language cannot abrogate the Court's clear construction that the "base of the user's fingers is not a region, but rather a specific location on the hand." (CCO 11:17-18.) The plain language of Claim 1 is clear that the *member* limitation specifies the actual location of the *member*.

In addition, the prosecution history of the '091 Patent indicates that the member limitation was intended to designate where the member was designed to fit in the hand. Throughout the prosecution of the '091 Patent, McHugh made several limiting amendments designed to clarify the location of the member before adding the retainer limitation. If the *retainer* limitation was designed to clarify the location of the *member*, McHugh could have

9

included that limitation much earlier in the prosecution history when asked by the Examiner. By contrast, McHugh waited to include the retainer limitation until the end of prosecution. (*See* Wytsma Decl., Ex. 9 at 6.)

As evidenced by the plain language of Claim 1 and the prosecution history of the '091 patent, there is simply no merit to McHugh's contention that the *retainer* limitation was intended to specify the location of the *member*, rather than the *member* limitation itself.

Under the Court's construction of the claims, the Court finds that no reasonable jury could conclude that H&B's Bionic Gloves are "configured to fit at a base of the user's fingers in a gap between a palm of the user's hand and the base of the user's fingers." ('091 Patent col.5 ll.14-17.) Accordingly, H&B is entitled to summary judgment in its favor.

### 2. McHugh Cannot Show that H&B's Accused Devices Infringe the '091 Patent Under the Doctrine of Equivalents.

"Under the doctrine of equivalents, 'a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is equivalence between the elements of the accused product or process and the claimed elements of the patented invention.'" *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1357 (Fed. Cir. 2005) (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997)).

The doctrine of equivalents thereby recognizes that:

> [t]he language in the patent claims may not capture every nuance of the invention or describe with complete precision the range of its novelty. If patents were always interpreted by their literal terms, their value would be greatly diminished. Unimportant and insubstantial substitutes for certain elements could defeat the patent, and its value to inventors could be destroyed by simple acts of copying. For this reason, the clearest rule of patent interpretation, literalism, may conserve judicial resources but is not necessarily the most efficient rule. The scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002) ("*Festo VIII*").

Although a patentee is entitled to argue that an accused device is equivalent to his or her claimed invention, the doctrine is not without limitations. H&B argues that the doctrine of

equivalents does not apply in this case because: (1) the Bionic finger pads do not serve the same gap-filling function or achieve the same result as the member claimed in the '091 Patent; (2) a finding that the finger pads infringe the '091 Patent would vitiate the claimed member's location in the hand; and (3) prosecution history estoppel bars any claim of infringement by equivalents. McHugh argues: (1) H&B has not submitted any admissible evidence to support their contention that the bionic finger pads do not serve the same gap-filling function or achieve the same result as the member claimed in the '091 Patent; and (2) the underlying rationale of the narrowing amendment bore no more than a tangential relation to the equivalent at issue.

### a. Function-Way-Result Test.

If an accused element "performs substantially the same function in substantially the same way to obtain the same result," then it is said to be equivalent to the claim limitation. *Warner-Jenkinson Co.*, 520 U.S. at 38. H&B asserts that the Bionic finger pads do not serve the same gap-filling function or achieve the same result as the member claimed in the '091 Patent. McHugh once again points to Dr. Kleinert's deposition, which identifies that both the bionic finger pads and the proximal digital crease are located above the proximal phalanx A2 pulley. (Grewe Decl., Ex. QQ (Kleinert 6/23/09 Depo., 12:17-13:1, 17:6-18:7).) However, it does not follow that the bionic finger pads must be located in the proximal digital crease. For the same reasons discussed regarding literal infringement, Bionic finger pads are located above (distal) the proximal digital crease.

During claim construction, this Court found that "McHugh's construction is too broad because the proximal phalanx A2 pulley region encompasses not only the location where the gap is formed, but the part of the finger above that location as well." (CCO 11:13-15.) This Court construed "base of the user's fingers" to mean "the location where the palm joins the fingers." (*Id.* at 11:21.) The patent explicitly states in several places that the grip is successful because it is designed to fill a gap and prevent the ligament and associated muscle and skin tissue from being forced over the fingers. ('091 Patent col.3 ll.19-22, col.1 ll.48-52, col.4 ll.49-53; *see also* CCO 11:4-5.) "If the member were above both the palm and the base of the fingers, it would not be able to separate the superficial transverse metacarpal ligament from the

1 fingers." (CCO 11:15-16.) Because the Court has found that the Bionic finger pads rest *above* the base of the fingers, the pads are unable to separate the superficial transverse metacarpal ligament from the fingers.

Accordingly, the Bionic Gloves do not provide the same function as the subject matter claimed by the '091 Patent.

### b. McHugh's theory of equivalents vitiates the member element.

H&B also asserts that the "all elements" rule limits the doctrine of equivalents in this case because McHugh's theory of equivalents vitiates the member element. "The 'all elements' rule attempts to balance the doctrine of equivalents with the basic patent law principle that claim language defines the scope of an invention and every limitation is material." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1016 (Fed. Cir. 2006). Because each element is material to defining the scope of an invention, the "doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson*, 520 U.S. at 29. Thus, the all elements rule mandates that a doctrine of equivalents analysis "be assessed on a limitation-by-limitation basis, rather than from the perspective of the invention as a whole, and that no limitation be read completely out of the claim." *DePuy Spine*, 469 F.3d at 1016 (citing *Freedman Seating Co.*, 420 F.3d at 1358.). Thus, "under the particular facts of a case, ... if a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court." *Warner-Jenkinson*, 520 U.S. at 39 n.8.

The Federal Circuit has noted that "[t]here is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule. Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Freedman Seating*, 420 F.3d at 1359.

As addressed above, McHugh's theory of literal infringement and infringement by equivalents seeks to replace limiting language in the member limitation with broader language

in the retainer limitation. This Court expressly rejected McHugh's contention that the member be configured to fit at the proximal phalanx A2 pulley region. (CCO 11:11-19.) However, because the retainer limitation only required that the retainer retain the member "adjacent to the base of the user's fingers," this Court construed that term more liberally to mean "near the proximal phalanx A2 pulley region of the user's fingers." (*Id.* at 12:22-24.)

McHugh may not pick and choose the term that is construed the most broadly to determine the location of the claimed member. Accepting McHugh's theory would vitiate the limitation that the member be configured to fit "at a base of the user's fingers" in "a gap between the palm of the user's hand" and "the base of the user's fingers." Accordingly, the Court is not persuaded by McHugh's argument based on the doctrine of equivalents.

### c. McHugh is barred by prosecution history estoppel.

In *Festo VIII*, the Supreme Court noted that the application of the doctrine of equivalents necessarily "renders the scope of patents less certain." *Festo VIII*, 535 U.S. at 732. "Estoppel is a 'rule of patent construction' that ensures that claims are interpreted by reference to those 'that have been cancelled or rejected.'" *Id.* at 733 (quoting *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-21 (1940)). The doctrine of prosecution history estoppel therefore works to achieve a balance between a patentee's right to claim infringement by equivalents and the public's right to know the scope of a patent. If a "patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent." *Id.* at 733-34; *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366 (Fed. Cir. 2003) ("*Festo IX*").

Under the teachings of *Festo VIII* and *Festo IX*, prosecution history estoppel applies where an amendment during prosecution narrows the literal scope of the claim. *See Festo IX*, 344 F.3d at 1366. "If the amendment was not narrowing, then prosecution history estoppel does not apply." *Id.* If, however, an "accused infringer establishes that the amendment was a narrowing one, then the second question is whether the reason for that amendment was a substantial one relating to patentability." *Id.* If the answer to this question is yes, a

13

presumption arises that the patentee has "surrendered all territory between the original claim limitation and the amended claim limitation." *Id.* at 1367 (citing *Festo VIII*, 535 U.S. at 740). "The standard for determining whether particular subject matter was relinquished is an objective one that depends on what a competitor reasonably would conclude from the patent's prosecution history." *Mark I Marketing, Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 291 (Fed. Cir. 1995); *cf. Festo IX*, 344 F.3d at 1369.

The party asserting prosecution history estoppel has the burden to establish that a patentee made a narrowing amendment. If that party meets its burden, and the presumption of surrender arises, the burden then shifts to the patentee to rebut the presumption of surrender by demonstrating that: (1) an alleged equivalent was not foreseeable at the time of the amendment; (2) the rationale underlying the narrowing amendment bears no more than a tangential relationship to the equivalent in question; or (3) "some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Festo IX*, 344 F.3d at 1369-70 (citing and quoting *Festo VIII*, 535 U.S. at 738, 740-41.)

"Issues relating to the application and scope of prosecution history estoppel, including whether the presumption of surrender of subject matter has arisen and whether it has been rebutted, are questions of law to be decided by the court." *Biagro W. Sales, Inc. v. Grow More, Inc.*, 423, F.3d 1296, 1301-02 (Fed. Cir. 2005) (citing *Festo IX*, 344 F.3d at 1368). Furthermore, although rebuttal of the presumption of surrender may involve factual questions, because those questions pertain to legal issues, the Court can resolve such issues on summary judgment. *See Festo IX*, 344 F.3d at 1368 & n.3; *Biagro*, 423 F.3d at 1302.

Here, McHugh repeatedly amended Claim 1 to define the precise location of the member and, therefore, McHugh cannot claim a broader definition based on the doctrine of equivalents. McHugh initially submitted a broad claim that the member be "configured to fit adjacent to a user's superficial transverse metacarpal ligament and adjacent to a user's finger." (Wytsma Decl. Ex. 2 at 8.) When that claim was rejected in light of prior art and the Examiner encouraged McHugh to specify clearly the location of the member, McHugh settled on the final claim language: "at a base of the user's fingers" in "a gap between the palm of the user's hand"

14

and "the base of the user's fingers." (*Id.* Ex. 9 at 1.) Because the amendments narrowed the scope of Claim 1 to overcome prior art, McHugh has presumptively surrendered the territory between the original Claim 1 and the amended Claim 1. *See Festo IX*, 344 F.3d at 1367 (holding that if an amendment narrows the scope of a claim for a reason related to patentability, then the patentee has surrendered all territory between the original claim limitation and the amended claim limitation).

McHugh does not appear to contest the presumption of surrender, but instead asserts that the presumption is rebutted because it is the retainer limitation, not the member limitation that defines the actual location of the member. Accordingly, McHugh contends that the narrowing amendments to the member limitation bear no more than a tangential relation to the equivalent at issue. As addressed above, the Court is not persuaded by this argument. It is clear from both the plain language of Claim 1 as well as the prosecution history of the '091 Patent, that the member limitation defines the location of the member. The claim amendments are directly related to the equivalent at issue.

Accordingly, the Court concludes that H&B has established that the *Festo* presumption of surrender arises in this case and McHugh has not met its burden to rebut the *Festo* presumption. Therefore, McHugh is barred from asserting infringement by equivalents.

For the foregoing reasons, "the evidence is such that no reasonable jury could determine two elements to be equivalent." *See Warner-Jenkinson*, 520 U.S. at 39 (citing Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 322-23)). H&B is entitled to summary judgment of non-infringement under the doctrine of equivalents.

## CONCLUSION

For the foregoing reasons, H&B's motion for summary judgment of non-infringement is GRANTED and McHugh's motion for summary judgment is DENIED. A separate judgment shall issue.

**IT IS SO ORDERED.**

Dated: February 24, 2010

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

15